# In the United States Court of Federal Claims

No. 22-414

Filed: March 3, 2023

**COTTER CORPORATION, (N.S.L.),**

   *Plaintiff*,

**v.**

**THE UNITED STATES,**

   *Defendant.*

*Alejandro L. Sarria,* Miller & Chevalier Chartered, Washington, D.C., for Plaintiff.

*John H. Roberson,* Senior Trial Counsel, *Franklin E. Wright, Jr.,* Assistant Director, *Patricia M. McCarthy*, Director, and *Brian M. Boynton,* Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND ORDER DISMISSING

**TAPP, Judge.**

  Turning "swords into plowshares" characterized the post-World War II transformation of destructive atomic power into usable consumer energy. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 193 (1983). Fulfillment of that ambition required relaxation of the federal government's "monopoly over fissionable materials and nuclear technology." *Id.* at 194. However, developing nuclear energy production carries potentially enormous risk to life and property. To offset such risk, Congress passed the Price-Anderson Act ("PAA") which "encourage[d] private investment in commercial nuclear power by placing a cap, or ceiling, on the total amount of liability" the nuclear industry faced in the event of an accident and provided a system of government indemnification. *Backgrounder on Nuclear Ins. & Disaster Relief*, U.S. Nuclear Regul. Comm'n (Apr. 11, 2022), https://www.nrc.gov/reading-rm/doc-collections/fact-sheets/nuclear-insurance.htm. The most infamous instance of accidental injury, the Three Mile Island Nuclear Power Plant in Pennsylvania, resulted in approximately $71 million in claims and litigation costs. *Id.*

  The genesis of the present litigation involves the exposure of hundreds of St. Louis area residents to radioactive material in the years following World War II. *McClurg v. MI Holdings*,

*Inc.*, 933 F. Supp. 2d 1179 (E.D. Mo. 2013).[1] Ultimately, the parties reached a settlement, though related litigation continues today. *See, e.g.*, *Butler v. Mallinckrodt LLC*, No. 4:18-cv-01701-AGF, 2022 WL 4598531, at *1 (E.D. Mo. Sept. 30, 2022) (plaintiffs "assert public liability actions under" the PAA).

Here, Plaintiff, Cotter Corporation (N.S.L.) ("Cotter"), seeks compensation from the United States for the costs of defending and settling the "public liability" action regarding radioactive material Cotter purchased from Mallinckrodt Chemical Works ("Mallinckrodt"). As provided in the PAA, a "public liability action" involves the assertion that another party bears the "legal liability arising out of or resulting from a nuclear incident." 42 U.S.C. § 2014(w). Cotter's indemnification claims implicate the PAA and a contract between the United States and Mallinckrodt. The United States asserts that (1) Cotter's PAA claim fails to state a claim upon which relief can be granted because it does not implicate either potential avenue for statutory indemnification–contractual or licensing indemnification; and (2) Cotter lacks standing because it did not plausibly allege it was an intended third-party beneficiary of the Mallinckrodt agreement. The Court agrees with the United States on both counts; therefore, the United States' Motion to Dismiss is **GRANTED**.

## I. Background

### A. Statutory Framework of the Price-Anderson Act

Following World War II, Congress sought to encourage private sector involvement in nuclear energy development. To do so, it established the Atomic Energy Commission ("AEC" or "Commission") to manage programs related to nuclear energy, and later provided for the licensing of private nuclear reactors regulated by the AEC. Atomic Energy Act of 1946, Pub. L. No. 79-585, §§ 1–2, 60 Stat. 755; Atomic Energy Act of 1954, Pub. L. No. 83-703, 68 Stat. 919 ("1954 Act"). Despite investment incentives included in the 1954 Act, the risk of liability following a nuclear disaster hindered private investment, so Congress enacted the PAA in 1957. Pub. L. No. 85-256 § 4, 71 Stat. 576 (current version at 42 U.S.C. § 2210). The PAA has a "dual purpose" of both "protecting the public and encouraging the development of the nuclear energy industry." *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 59 (1978).

The PAA contained indemnification provisions to incentivize both contractor and licensee participation. *See, e.g.*, *id.* Importantly, these provisions distinguish between contractors and licensees. Pub. L. No. 85-256 §§ 170(a)-(d).[2] The PAA authorized the Commission to enter into indemnification agreements with any entity engaged in activities "under contract for the benefit of the United States involving activities under the risk of public liability for a substantial

---

[1] In 2012, the case was originally named *McClurg v. MI Holdings*, *Inc.*, 933 F. Supp. 2d 1179 (E.D. Mo. 2013). It was later consolidated to become *McClurg v. Mallinckrodt, Inc.* For purposes of this Opinion and Order, it will be "*McClurg*."

[2] Both Cotter and the United States rely on statutory language from Section 170 which was in effect during the Mallinckrodt contract. (*See e.g.*, Mot. to Dismiss at 14–15; Pl.'s Resp. at 15). For purposes of this opinion, the Court will interpret Section 170.

nuclear incident." § 170(d). Indemnification agreements could, but did not necessarily, include an insurance requirement. *Id.*

Further, the PAA provided that only some commercial licensees were required—by statute or the Commission's discretion—to maintain liability insurance in the amount available from private sources. §§ 170(a)-(d). Specifically, the PAA provided licensees may have to:

> [M]aintain financial protection of such type and in such amounts as the [Commission] shall require . . . to cover public liability claims. Whenever such financial protection is required, it may be a further condition of the license that the licensee execute and maintain an indemnification agreement in accordance with subsection [170(c)].

§ 170(a). The PAA specified that the Commission[3] "agree[s] to indemnify and hold harmless the licensee and other persons indemnified . . . from public liability arising from nuclear incidents which is in excess of the level of financial protection required of the licensee." § 170(c). The indemnification could cover public liability arising out of or connected to the licensed activity. *Id.* Ultimately, the PAA provided federal licensees with robust layers of protection, including: (1) a system of mandatory private insurance, (2) indemnification from the government for public liability from nuclear incidents, and (3) limited liability for nuclear incidents. *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 476 (1999).

Under the PAA today, "public liability" refers to liability resulting from any "nuclear incident" or precautionary evacuation, except for workmen's compensation claims or claims resulting from war. 42 U.S.C. § 2014(w). A "nuclear incident" is any occurrence, injury, sickness, death, or damage to property resulting from the hazardous properties of nuclear material. § 2014(q). Taken together, these provisions provide "no fault" insurance scheme under which liability after an incident is assumed by the operator of a nuclear facility. Daniel Klein, *Litigation of Atomic Energy Act, 42 U.S.C.A. § 2011 et seq., and Amendments Thereto*, 156 Am. Juris. Trials 1, 3 (2022).

B.   *Contracts and Licenses at Issue*

In 1942, the United States War Department contracted with Mallinckrodt to produce refined uranium and operate two government plants;[4] the United States maintained ownership over the radioactive material. (Compl. at 4, ECF No. 1; Mot. to Dismiss at 16–17, ECF No. 16). Initially, Mallinckrodt operated a facility in downtown St. Louis, Missouri ("St. Louis

---

[3] In the 1970s Congress abolished the AEC and divided its functions between the Energy Research and Development Administration and the Nuclear Regulatory Commission. Energy Reorganization Act of 1974, Pub. L. No. 93-438, § 104(a), 88 Stat. 1233, 1237. It went on to establish the Department of Energy ("DOE") in 1977. The Department of Energy Organization Act, Pub. L. No. 95-91, §§ 201, 301, 703, 91 Stat. 565, 569, 577–78, 606.

[4] Mallinckrodt "[p]urified and provided all of the uranium oxide used by the Manhattan Project[.]" *Our Story*, Mallinckrodt Pharmaceuticals, https://www.mallinckrodt.com/about/our-story/ (last visited Feb. 27, 2022).

Downtown Site" or "SLDS") but in the 1950s it began transporting residue material to the St. Louis Airport ("St. Louis Airport Site" or "SLAPS"). (Compl. at 4). This arrangement continued until 1966 through a series of supplemental agreements ("SA"). (Mot. to Dismiss at 17). Most SAs merely adjusted the price or quantity of materials, but some substantively changed the Mallinckrodt contract. (*Id.*).

For example, under SA No. 45 the United States and Mallinckrodt agreed that "[t]he Contractor shall promptly" determine whether a claim "arising out of, based on or caused by the toxicity and/or radioactivity of uranium-bearing raw materials and/or products or byproducts" is connected to the contract. (Ex. A at 248–50 at Art. III-E(1) and (3), ECF No. 16-2).[5] Accordingly, Mallinckrodt was required to "furnish promptly" copies of documents related to any litigation to the United States which was authorized to settle or defend the lawsuit. (*Id.* at Art. III-E(3)). Under SA No. 81, Mallinckrodt again agreed to promptly notify the United States about any impending lawsuit. (*Id.* at 495–96 at Art. III-E(3)). Further, indemnification was available "only to the extent that [Mallinckrodt] is not protected and made whole by insurance." (*Id.* at 494 at Art. III-E(1)). As a contractor, Mallinckrodt was required to maintain insurance. (*Id.* at 494 at Art. III-E(2)).

SA No. 115 reiterated Mallinckrodt's obligation to promptly notify the contracting officer ("CO") of any pending litigation and provide "all pertinent papers" related to the action or claim. (*Id.* at 674 at Art. XIV(2)). Further, it stipulated that Mallinckrodt could not assign or transfer the contract or any interest or claim under the contract to a third party, unless to a subsidiary or first approved by the CO. (*Id.* at 667 at Art. VII). SA No. 124 added "certain provisions relative to the indemnification of the Contractor and others with respect to public liability resulting from certain nuclear incidents" pursuant to Section 170 of the Atomic Energy Act. (*Id.* at 742). Importantly, it also incorporated the PAA's updated 1962 definitions and indemnification provisions into the contract. (*Id.* at 743–44). Specifically, it provided that Mallinckrodt and "any other person indemnified" will be indemnified by the Commission against claims for public liability and "the reasonable costs of investigating and settling claims, and defending suits for damage for such public liability . . . under Section 170 of the Act." (*Id.* at 743).

In 1966, the Mallinckrodt contract ended when the AEC sold radioactive material at SLAPS to Continental Mining & Milling Company ("Continental"). (Ex. C, ECF No. 16-4). The sale stipulated that the material was sold "as is" and the United States did not warrant that the materials "will not result in injury or damage when used for any purpose[.]" (*Id.* at 2). The bill of sale also (1) required Continental to obtain a license, (2) passed title of the radioactive material to Continental, and (3) gave Continental "full responsibility for the care and custody of the material . . . after passage of title." (*Id.* at 2–3). The material was transferred from SLAPS to Latty Avenue in Hazelwood, Missouri, a small community located to the northwest of St. Louis. (Compl. at 6).

---

[5] The exhibits provided by the parties are consecutively paginated. Thus, the Court will cite to each as "Ex. _ at _." If a specific article or provision is referenced, the Court will cite to "Ex. _ at _ at Art_."

4

In 1967, Continental's assets, including the material at Latty Avenue, were foreclosed by its creditor, Commercial Discount Corporation ("Commercial Discount"). (Ex. B at ¶ 43, ECF No. 16-3). Commercial Discount then sold the radioactive material to Cotter between 1967 and 1969. (Ex. D, ECF No. 16-5). As a result, Cotter acquired a license with the AEC to continue operations at Latty Avenue. (Ex. F, ECF No. 16-7 (AEC License No. SUB-1022)). In 1973, Cotter transported some of the nuclear material from the Latty Avenue location to the West Lake Landfill in Bridgeton, Missouri. (Ex. B at ¶ 45). Cotter's AEC license expired in 1974. (Ex. F).

### C.   The McClurg Litigation

From February 2012 to 2018, Cotter was embroiled in tort litigation related to the "alleged release of radioactive source material" in St. Louis County, Missouri. (Compl. at 2, 9–13; Ex. B). Cotter notified the United States about the case in March 2012.[6] (Compl. at 9). In March 2013, the trial judge dismissed state law claims in the initial complaint citing federal preemption, labeled the case a "public liability action," and permitted the plaintiffs to replead under the PAA. (Compl. at 10; Ex. H at 6, ECF No. 16-9).

The amended *McClurg* complaint alleged that Cotter's activities between 1969 and 1973 released radioactive material into the surrounding environment, proximately causing injuries to the plaintiffs. (Compl. at 10–11). Specifically, the complaint traced the material from its original Mallinckrodt processing location at SLDS to SLAPs for storage to Latty Avenue. (*Id.* at 10). The complaint further alleged Cotter acquired the material located at Latty Avenue in 1969 and shipped most of it to Colorado; however, some "residue material remain[ed] at Latty Avenue." (*Id.*). This residue material was transported to the West Lake Landfill in 1973. (*Id.*). Regarding the PAA, the complaint claimed (1) the material qualified as a "source, special nuclear, or byproduct;" (2) each release of material into the environment constituted a "nuclear incident;" and (3) the injuries sustained from each "nuclear incident" was a "public liability action." (*Id.* at 11). Following stalled settlement discussions, the trial court directed DOE in February 2018, to send an authorized representative to mediation because the United States was a "possible indemnitor." (*Id.* at 11–12). The DOE declined to participate. (*Id.* at 12). Cotter and the *McClurg* plaintiffs reached a settlement agreement in September 2018. (*Id.*) In December 2019, the trial court determined the amount was "fair and reasonable compensation." (*Id.*).

### D.   Present Litigation

In April 2022, Cotter filed its Complaint at the Court of Federal Claims. Cotter brings two counts: statutory indemnification under the PAA (Count I) and contractual indemnification as the third-party beneficiary of a PAA indemnification agreement (Count II). (Compl. at 13–15). Specifically, Cotter claims it is a "person indemnified" as defined in the PAA and thereby entitled to compensation for its "public liability action." (Compl. at 13; Pl.'s Resp. at 15 (citing Section 170(d)), ECF No. 17). Cotter maintains it is "other persons indemnified" for purposes of

---

[6] The parties dispute whether this notification was sufficient to "tender[] the litigation for DOE indemnification or representation." (Mot. to Dismiss at 23; Pl.'s Resp. at 34). For purposes of this opinion the Court assumes the government was notified no later than February 2018 when the trial judge directed DOE to send a representative to mediation. (Compl. at 11–12).

5

the indemnification agreement between the AEC and Mallinckrodt. (Compl. at 14–15). Based on these allegations, Cotter believes it is entitled to judgment on its indemnification "for the costs of settling and defending the public liability action in *McClurg*[.]" (Compl. at 1, 15).

The United States moves to dismiss Cotter's indemnification claims on two grounds. First, the United States argues Cotter failed to appropriately plead either avenue for statutory indemnification under the PAA. (Mot. to Dismiss at 25). Second, the United States argues Cotter failed to allege it was the intended third-party beneficiary of Mallinckrodt's contract with the United States, thus it lacks standing to bring Count II. (*Id.* at 41–45). Accordingly, the United States moves to dismiss Cotter's claims for failure to state a claim upon which relief may be granted and lack of subject-matter jurisdiction.

## II.  Analysis

The Court's jurisdiction depends on the extent to which the United States has waived sovereign immunity. *United States v. Testan*, 424 U.S. 392, 399 (1976). The Tucker Act waives sovereign immunity over claims (1) arising under federal constitutional, statutory, or regulatory law; (2) for an express or implied contract with the United States; or (3) seeking damages in cases not sounding in tort. 28 U.S.C. § 1491(a)(1). However, the Tucker Act does not provide any substantive rights. *Ont. Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004). Therefore, the plaintiff must have a money-mandating source on which to base their cause of action. *Fisher v. United States*, 402 F.3d 1167, 1173 (Fed. Cir. 2005). A source is money-mandating if it triggers compensation for damages sustained due to a breach of the duties it imposes. *United States v. Mitchell*, 463 U.S. 206, 216–17 (1983) (internal citations omitted); *see also N.Y. & Presbyterian Hosp. v. United States*, 881 F.3d 877, 882–88 (Fed. Cir. 2018) (determining "shall be indemnified" in I.R.C. § 3102(b) was money-mandating); *Higbie v. United States*, 778 F.3d 990, 993 (Fed. Cir. 2015) (presuming damages in contract case satisfy money-mandating requirement).

When considering a motion to dismiss for lack of subject-matter jurisdiction, "a court must accept as true all undisputed facts asserted in the plaintiff's complaint and draw all reasonable inferences in favor of the plaintiff." *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed Cir. 2011). However, plaintiffs bear the burden of establishing subject-matter jurisdiction by a preponderance of the evidence. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Therefore, the Court must dismiss the claim if it lacks subject-matter jurisdiction. RCFC 12(h)(3). Standing is a threshold issue that involves the Court's subject-matter jurisdiction. *Lujan,* 504 U.S. at 560–61. If a plaintiff fails to establish standing, the Court lacks jurisdiction to render a decision on the merits of a claim. *Myers Investigative & Sec. Servs. v. United States*, 275 F.3d 1366, 1369–70 (Fed. Cir. 2002). For purposes of the standing inquiry, the Court assumes well-pled allegations of error to be true. *Square One Armoring Serv., Inc. v. United States*, 123 Fed. Cl. 309, 323 (2015) (citing *Digitalis Educ. Sols., Inc. v. United States*, 97 Fed. Cl. 89, 94 (2011), *aff'd*, 664 F.3d 1380 (Fed. Cir. 2012)).

If a claim survives a jurisdictional challenge, it is still subject to dismissal under RCFC 12(b)(6) for failure to state a claim upon which relief can be granted. *See Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When deciding a motion to dismiss under RCFC 12(b)(6), the court must again assume all undisputed facts in the complaint are true and draw all

reasonable inferences in the non-movant's favor. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); RCFC 12(b)(6). The court should assume the veracity of well-pleaded factual allegations and determine whether it is plausible, to find against the movant. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). As a result, "[t]o avoid dismissal under RCFC 12(b)(6), a plaintiff 'must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Am. Bankers Assc'n v. United States*, 932 F.3d 1375, 3180 (Fed. Cir. 2019) (internal citations omitted).

      A.     *Cotter failed to plausibly allege it qualifies for statutory indemnification under the PAA.*

The United States argues that Cotter failed to state a claim for statutory indemnification under either available avenue prescribed by the PAA. (Mot. to Dismiss 25–41). First, the United States contends Cotter failed to establish a relationship to a government contract as required by Section 170(d). (*Id.* at 25–36). The United States argues this relationship and its benefit to the government are essential to trigger this indemnification provision. (*Id*. at 29–30, 33–36). Second, the United States argues Cotter failed to establish eligibility for the PAA's licensee indemnification provision under Section 170(a). (*Id.* at 25, 36–41). Finally, the United States asserts that Cotter's indemnification liability theories ignore historical bills of sale and Cotter's purchase of the material which did not include indemnification rights. (*Id.* at 38–41). The Court addresses each argument.

      i.     <u>Cotter failed to plausibly allege indemnification eligibility under Section 170(d).</u>

As provided above, Section 170 originally laid out the indemnification and limitation of liability provision. Pub. L. No. 85-256 § 170 (1957) (current version at 42 U.S.C.§ 2210). The United States argues the language of Section 170(d) limited the government's indemnity obligations to parties engaged in "activities with a nexus to a [g]overnment contract" and that this requirement remains today. (Mot. to Dismiss at 26, 28). Cotter, however, contends that the "plain text and legislative history of the PAA" are expansive and not limited to persons with specific relationships with the government. (Pl.'s Resp. at 15). This dispute centers on specific indemnification of liability language in Section 170(d) and key PAA definitions. Therefore, the Court must begin "with the language of the statute itself." *Republic of Sudan v. Harrison*, 139 S.Ct. 1048, 1056 (2019) (internal citations omitted). To do so, the Court looks at the plain language as well as "the placement and purpose of the language within the statutory scheme." *WestRock Va. Corp. v. United States*, 136 Fed. Cl. 267, 276 (2018) (internal citation omitted); *Beecham v. United States*, 511 U.S. 368, 372 (1994) ("The plain meaning that we seek to discern is the plain meaning of the whole statute, not of isolated sentences.").

Section 170(d) provides for indemnification agreements between the AEC and contractors:

> [T]he Commission is authorized . . . to enter into agreements of indemnification with its contractors for the construction or operation of

>production or utilization facilities or other activities under contracts for the benefit of the United States involving activities under the risk of public liability for a substantial nuclear incident. In such agreements of indemnification the Commission may require its contractor to provide and maintain financial protection of such a type and in such amounts as the Commission shall determine to be appropriate to cover public liability arising out of or in connection with the contractual activity, and shall indemnify the persons indemnified against such claims above the amount of the financial protection required, in the amount of $500,000,000 including the reasonable costs of investigating and settling claims and defending suits for damage in the aggregate for all persons indemnified in connection with such contract and for each nuclear incident.

§ 170(d).

First, the parties disagree whether such language limits indemnity to persons facing public liability because of their activity under or with some nexus to a government contract. (Mot. to Dismiss at 27–28; Pl.'s Resp. at 12, 17). The United States argues Cotter was not "involved in the Mallinckrodt's contract with the [g]overnment" and that its alleged "free-floating right to indemnification" derives from a definition "beyond the strictures and limitations" of Section 170. (Mot. to Dismiss at 25). Rather than an untethered right, the United States asserts PAA indemnification was tied to the AEC's indemnification agreements "with its contractors" who operate under "contracts for the benefit of the United States[.]" (Mot. to Dismiss at 26–27 (quoting § 170(d)) (emphasis removed)). The United States acknowledges that Mallinckrodt's contract did incorporate the indemnification provision, (*id.* at 29), but argues that Cotter's activities were unrelated to "the contractual activity of Mallinckrodt's contract with the United States." (*Id.* at 30 (emphasis removed)). For its part, Cotter emphasizes the discretionary nature of the agreements and contends that "nothing in Section 170(d) purported to limit the government's indemnity obligations to persons who have certain contracts or relationships or who perform certain contractual activities." (Pl.'s Resp. at 19). Cotter asserts the PAA does not impose such contractual requirements. (*Id*. at 17). The United States' arguments are persuasive while Cotter's are not.

The Court addresses the plain language of Section 170(d) to determine whether indemnification requires a nexus to contractual activity. *See Republic of Sudan*, 139 S.Ct. at 1056. The first sentence of Section 170(d) plainly emphasizes the importance of government contractors and a contractual relationship. For example, it states that the Commission may enter into indemnification agreements "with its contractors" who are engaged in activities that risk nuclear incidents. § 170(d). It further provides that agreements also include "other activities under contracts for the benefit of the United States[.]" *Id.* Such language is consistent with the United States' interpretation that agreements require some nexus or connection to a government contract. (Mot. to Dismiss at 26–27). The inclusion of "activities" is always couched in relation to the AEC's contractors or those operating "under contract." *See* § 170(d). The Commission's authority to enter into indemnification agreements is presented within the context of a contractual activity that benefits the government's nuclear program. Accordingly, the United States does not, as Cotter asserts, "overread" this sentence to limit government liability by emphasizing a relationship with the government itself or an indemnified contractor. (Pl.'s Resp.

8

at 18). Rather, the statutory language itself explicitly underscores the importance of a contractual relationship.

The second sentence of Section 170(d) specifies that "[i]n such [indemnification] agreements" contractors may be required to have financial protection. § 170(d). This language indicates that contractors (and other eligible parties) who may seek indemnification are subject to specific requirements—here, financial protection or insurance. The sentence goes on to provide that the government "shall indemnify the *persons indemnified* against such [public liability claims] above the amount of the financial protection required . . . for all persons indemnified *in connection with such contract* and each nuclear incident." § 170(d) (emphasis added). Such language again indicates some required nexus to contract activity as well as financial protections required by the AEC.

Cotter contests this interpretation of Section 170(d) by emphasizing the inclusion of "persons indemnified" in the second sentence. (Pl.'s Resp. at 16–17, 19). In 1962, the PAA defined "persons indemnified" as "the person with whom an indemnity agreement is executed and *any other person* who may be liable for public liability" for incidents within the United States. Pub. L. No. 87–615, § 5 (1962) (emphasis added). Cotter latches onto "any other person" in this definition to argue certain contracts or relationships were not required to obligate government indemnification. (Pl.'s Resp. at 21). Cotter argues that such language means "an unaffiliated third party" may qualify for federal indemnification based on their activities and liability, not because of their privity to the government. (*Id.* at 11, 18–22). Cotter further argues if Congress wanted to limit the scope of "persons indemnified" it could have used more qualified language such as "any person who may be liable for public liability due to their activities under an AEC contract." (*Id*. at 19–20). These arguments are unavailing.

The Court concedes that as an isolated term, "persons indemnified" appears to be untethered to a nexus to contractual activity. But the Supreme Court has held that "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Therefore, the Court looks to broader statutory context of PAA indemnity. For example, Cotter's interpretation would ignore the "financial protection required" under the agreements that qualify the government's obligation to indemnify. § 170(d). Similarly, "in connection with such contract" would be rendered superfluous by Cotter's interpretation, (Pl.'s Resp. at 11); it would disregard the proverbial forest for the tree. *See Sullivan v. McDonald*, 815 F.3d 786, 790 (Fed. Cir. 2016) ("[W]e attempt to give full effect to all words contained within that statute or regulation, thereby rendering superfluous as little of the statutory or regulatory language as possible.") (internal citations omitted). The Court will not disregard other clauses in Section 170(d) in favor of one cherry-picked term. *Williams v. Taylor*, 529 U.S. 362, 404 (2000) ("we must give effect, if possible, to every clause and word of a statute.") (internal citations and quotations omitted).

Second, the Court addresses the incorporation of PAA indemnification in the Mallinckrodt contract. The United States argues the contractual language itself helps shed light on the "intended linkage between contractual activity undertaken for the United States' benefit and the [g]overnment's [indemnification provision]." (Mot. to Dismiss at 29). Specifically, the United States cites SA No. 124 wherein the government agreed to indemnify Mallinckrodt and

9

"other persons indemnified" for claims of "public liability." (*Id.*; Ex. A at 742–46). "[P]ublic liability" is defined as that which "arises out of or in connection with the contractual activity" and "arises out of or results from" four types of nuclear incidents. (Ex. A at 42–43). Such language mirrors the language used in Section 170(d).

Specifically, mirrored indemnification obligations under Section 170(d) apply to public liability "arising out of or in connection with the contractual activity[.]" § 170(d). Cotter correctly points out that the Court should analyze the ordinary meaning of those terms. (Pl.'s Resp. at 15 (citing *Nicely v. United States*, 23 F.4th 1364, 1369 (Fed. Cir. 2022) ("When terms used in a statute are undefined, we give them their ordinary meaning.") (internal citations omitted)). Therefore, the Court examines the phrases "arising out of" and "in connection with." Merriam-Webster defines "arise" as "to originate from a source." *Arise*, Merriam-Webster, https://www.merriam-webster.com/dictionary/arise (last visited Jan. 26, 2023). The Federal Circuit recently stated that "arising out of" is narrower than "relating to" because it "usually indicates a causal connection." *Kannuu Pty Ltd. v. Samsung Elecs. Co., Ltd.*, 15 F.4th 1101, 1106 (Fed. Cir. 2021) (interpreting contractual terms in patent case). As such, the Court understands "arising out of" to indicate a relationship to the contractual activity. Further, Merriam-Webster defines "connection" as a "causal or logical relation or sequence." *Connection*, Merriam-Webster, https://www.merriam-webster.com/dictionary/connection (last visited Jan. 26, 2023). This definition also evokes a tie or relationship between two things. In Section 170(d) and in SA No. 124 these terms precede "the contractual activity." § 170(d). As such, there must be a relationship to contractual activity because "Congress' choice of words is presumed to be deliberate." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013).

Third, the Court declines to analyze the PAA's legislative history and subsequent reports to Congress to determine congressional intent. It is the Court's role to interpret statutory language enacted by Congress. *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 461 (2002). If the Court determines that statutory language is clear and unambiguous, "the inquiry ends with the plain meaning." *Myore v. Nicholson*, 489 F. 3d 1207, 1211 (Fed. Cir. 2007) (internal citation omitted); *Barnhart*, 534 U.S. at 462 ("When the words of a statute are unambiguous, then [the] first canon is also the last: 'judicial inquiry is complete.'"). The language of Section 170(d) is clear and unambiguous. The Court determines that Section 170(d) required some nexus to a contractual relationship for the benefit of the government. It further determines that such language limits who may be party to or benefit from an indemnification agreement.

Even if the Court engaged with the PAA's legislative history, it does little to "shed light on what legislators understood an ambiguous statutory text to mean when they voted to enact it into law." *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 242 (2011). Here, the United States and Cotter are both able to select language supporting their arguments. For example, the United States quotes a 1965 Joint Committee on Atomic Energy report that stated the PAA was "designed to protect organizations participating in the atomic energy program" and that indemnification extends to organizations that "assist the [g]overnment in carrying out the atomic energy program[.]" (Mot. to Dismiss at 31 (quoting Ex. J at 1–2, 42, ECF No. 16-11)). Conversely, Cotter highlights a 1957 report from that same committee stating "persons indemnified" included "any person who might be found liable, regardless of the contractual relation [to the prime contractor.]" (Pl.'s Resp. at 22 (quoting Ex. 1 at 18, ECF No. 17-2)). This language highlighted by Cotter is absent from the PAA itself. Although legislative history may

be used in judicial analysis, such history does not "trump[] clear text." *Bartels Tr. For the Benefit of Cornell Univ. ex rel. Bartels v. United States*, 617 F.3d 1357, 1361 (Fed. Cir. 2010). Ultimately, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992). Accordingly, the Court adheres to the plain meaning of the statute and declines to wade through the mire of the PAA's legislative history.

Finally, the Court addresses whether Cotter satisfies the nexus required to implicate the PAA's indemnification obligations. The United States argues that Cotter's activities were unconnected to Mallinckrodt's contractual activity performed for the benefit of the government, thus it is not entitled to indemnification. (Mot. to Dismiss at 29–30, 33–36). The United States emphasizes it "did not sell the radioactive material to Cotter" but instead to other third parties and it did not benefit from Cotter's activities with the radioactive material. (*Id.* at 34). The United States reasons the PAA indemnification provision should be read within the context of the Act and, not turn on the "uncontextualized definition of 'person indemnified.'" (*Id.* at 36). Cotter argues *McClurg* was based on its handling of "legacy nuclear material," therefore, it falls within the scope of "public liability" under the PAA. (Pl.'s Resp. at 12, 25). Cotter further argues it "actually handled and possessed" the material so it is reasonable to infer entitlement to relief. (*Id.* at 25). The Court agrees with the United States that Cotter's ownership over the radioactive material was too far "downstream" from Mallinckrodt, rendering it outside the Section 170(d) indemnification obligation. (Mot. to Dismiss at 26–27).

It is undisputed that Cotter was not in privity of contract with Mallinckrodt. As detailed above, Mallinckrodt's contract with the AEC ended in 1966 when the government transferred the material's title to Continental. (Mot. to Dismiss at 19). At that time, Mallinckrodt was no longer producing refined uranium and operating the plants under contract with the government. (Compl. at 4; Mot. to Dismiss at 16–17, 19). Accordingly, the benefit to the government's nuclear program ended. Further, Cotter only became linked to the material in 1969 after it had changed hands several times. (Mot. to Dismiss at 19–21). Title transfers between 1967 and 1969 only involved private entities, not the government. (Mot. to Dismiss at 16–17, 19). The question then becomes, is it plausible to infer the United States is liable for damages related to activity after the conclusion of the Mallinckrodt contract and once Cotter was responsible for the material.

Here again, Cotter's argument relies on issues addressed above, namely, that it qualifies as a "persons indemnified" and its activities "ar[ose] out of or in connection with the contractual activity." § 170(d). However, Cotter's handling of the material did not "originate from" Mallinckrodt's contractual activity, but rather possession by third parties. The Court finds handling material that was once under Mallinckrodt's contract is an insufficient causal sequence to trigger indemnification obligations, particularly considering Section 170(d)'s limiting language analyzed above. For the stated reasons, Cotter failed to plausibly claim it qualifies for statutory indemnification under Section 170(d).

### ii. Bills of Sale and Government Disavowal of Responsibility

The Court analyzes whether disavowal of the government's responsibility for the radioactive material applies to this case. The United States argues that the "chain of sales transactions" for the material demonstrates the government "did not intend" to extend

indemnification rights to those purchasers. (Mot. to Dismiss at 38). Specifically, the United States highlights the "as is" clause in the Continental sale as well as the Residue Purchase Agreement between Commercial Discount and Cotter to show they contained no promises for government indemnity. (*Id*. at 38–39). The United States also reiterates that Cotter "cannot claim that it is entitled to PAA indemnification as 'a person indemnified.'" (*Id*. at 39).

For its part, Cotter argues the sale and licensing documents are irrelevant to its indemnity claims under the PAA. (Pl.'s Resp. at 28). Specifically, Cotter argues Count I only addresses statutory indemnity, rendering such contractual documents irrelevant. (*Id*.) Cotter further asserts that congressional intent and "broad terms" like "person indemnified" support its position that government liability extends to commercial entities. (*Id*. at 28–29). Cotter also argues if the government wanted to disavow responsibility, it should have explicitly done so in the Mallinckrodt indemnity agreement. (*Id.* at 29–30). This argument fails to acknowledge that the government cannot disavow a statutory obligation through contract interpretation. *See Neb. Pub. Power Dist. v. United States*, 590 F.3d 1357, 1365 (Fed. Cir. 2010) (discussing order "prohibit[ing] the government from using contract interpretation as a means of avoiding its statutory obligations"). Cotter concludes that the existence of an indemnification agreement between Mallinckrodt and the AEC was sufficient to support both Counts I and II. (*Id.* at 30).

Cotter is merely rehashing earlier arguments that the Court found unpersuasive. Furthermore, the documents at issue are relevant to the chain of title for the radioactive material as explored above. They also shed light on whether Cotter was an intended third-party beneficiary of the Mallinckrodt contract. Accordingly, the bills of sale are considered by the Court. As explained above, the Court determines that Cotter failed to allege facts "'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief" under Sections 170(a) and (d). [7] *Am. Bankers Assc'n*, 932 F.3d at 3180. Accordingly, Cotter failed to state a claim for PAA statutory indemnification for which relief can be granted and Count I must be dismissed.

### B.   *Cotter cannot prevail on its contractual indemnification theory.*

The United States argues Cotter lacks standing to bring Count II because Cotter failed to plausibly allege it was the intended third-party beneficiary of Mallinckrodt's contract with the United States. (Mot. to Dismiss at 41–45). The United States first contends that Cotter's claims rely on its overbroad reading of "persons indemnified" and that the contracting parties did not have the authority to "extend any such indemnification[]" to Cotter. (*Id.* at 43–44). Second, the United States argues Cotter failed to allege that the government breached its contract with Mallinckrodt so it cannot bring a third-party beneficiary claim before this Court. (*Id.* at 44).

---

[7] The United States also argues Cotter fails to plausibly plead indemnification under Section 170(a) as a licensee. (Mot. to Dismiss at 36). Section 107(a) addresses the indemnification and limitation of liability for licensees. *See* § 170(a). For its part, Cotter does not argue its AEC license provided for indemnification under Section 170(a). (Compl. at 6; Pl.'s Resp at 26–28). Accordingly, the Court does not engage in an analysis of Section 170(a) because Cotter does not claim eligibility under its indemnification provision.

Cotter disagrees. (Pl.'s Resp. at 30). First, Cotter argues the facts alleged in the Complaint were sufficient to state a claim because it is within "a class clearly intended to be benefited" by the indemnity agreement. (*Id*. at 31). Cotter also contends the Mallinckrodt contract incorporated the PAA, qualifying it for indemnification. (*Id.* at 32–33). Second, Cotter argues it sufficiently supported the assertion that the government breached the indemnification agreement when it rejected indemnity claims in *McClurg*. (*Id.* at 33–36). Specifically, Cotter argues it did not have a duty to present indemnity claims to the government but that the United States was aware of *McClurg*. (*Id.* at 34). Finally, Cotter concludes that it has standing to pursue Count II because it was the intended third-party beneficiary under the PAA indemnification agreement and the government breached its contractual duty. (*Id*. at 36). The Court again agrees with the United States and finds Cotter's arguments unavailing.

Standing is a threshold jurisdictional issue. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998). Typically, standing in a contract claim against the government requires the plaintiff to be in privity of contract with the United States. *Pac. Gas & Elec. Co. v. United States*, 838 F.3d 1341, 1350 (Fed. Cir. 2016). However, the Federal Circuit permits an exception for intended third-party beneficiaries. *See id.* at 1361. "In order to prove third-party beneficiary status, a party must demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly." *Flexfab, LLC v. United States*, 424 F.3d 1254, 1259 (Fed. Cir. 2005) (citing *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001)). Importantly, "[t]he intended beneficiary need not be specifically or individually identified in the contract, but must fall within a class clearly intended to be benefited thereby." *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997). To find intent, the Court looks at:

> (1) [W]hether the language of the contract demonstrates that the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him, (2) the governing statute and its purpose, to the extent that the contract implements a statutory enactment, or (3) other objective evidence.

*Boye v. United States*, 90 Fed. Cl. 392, 409 (2009) (internal citations omitted). If Cotter cannot establish standing, the Court must dismiss Count II for lack of subject-matter jurisdiction. *Myers Investigative & Sec. Servs.*, 275 F.3d at 1369–70.

Against this backdrop, the Court must evaluate whether the AEC and Mallinckrodt intended for Cotter to directly benefit from their contract. *See Flexfab, LLC*, 424 F.3d at 1529; *see also Montana*, 124 F.3d at 1273. First, the Court looks to the terms of Mallinckrodt's contract with the United States, including the SAs described above, to determine if it would be reasonable for Cotter to rely on the promise to indemnify. *See Dewakuku v. Martinez*, 271 F.3d 1031, 1041 (Fed. Cir. 2001). Here, the United States argues the contract "does not identify Cotter as an intended beneficiary." (Mot. to Dismiss at 41). The United States explains the contract is silent regarding Cotter because it was a "downstream purchaser" of the material, its activities "were not undertaken for the benefit of the United States' contract with Mallinckrodt," and its license did not require financial protection. (*Id*. at 43). As such, the United States maintains that no contractual language indicates the AEC or Mallinckrodt intended to extend indemnification

13

rights to Cotter, who was not even considered when the contract was in effect. (*Id.*). The United States' arguments regarding contractual silence towards Cotter are unconvincing.

To show standing, Cotter need only demonstrate it falls within the class intended to benefit from the contract; it does not need to be "specifically or individually identified" in the Mallinckrodt contract as the United States seems to suggest. *Montana*, 124 F.3d at 1273. For its part, Cotter fails to engage with specific language in the Mallinckrodt contract and SAs. (Pl.'s Resp. at 30–33). Instead, Cotter relies on terms like "persons indemnified" and "arising out of" and "in connection with" in the PAA. (*Id.*). As the Federal Circuit recently stated, parties "are responsible for advancing the facts and arguments entitling them to relief." *Baude v. United States*, 955 F.3d 1290, 1304–05 (Fed. Cir. 2020) (internal citations). Accordingly, the Court turns its attention from language of the contract and SAs to the PAA. *See id.*; *see also Boye*, 90 Fed. Cl. at 409.

Here, both the United States and Cotter rehash previous arguments regarding the language and purpose of the PAA. Specifically, the United States argues Cotter was "a downstream purchaser of the radioactive material" and thus subject to the "express disavowal of [g]overnment responsibility for the material;" Cotter's activities did not benefit the government contract with Mallinckrodt, and it was not a "persons indemnified" for purposes of public liability. (Mot. to Dismiss at 43). Cotter contends belonging to the class of "other persons indemnified" under Section 170(d) sufficiently states intent. (Pl.'s Resp. at 31). Cotter again highlights the language "arising out of or in connection with" the contract. (*Id.* at 32). Again, the Court finds the United States' arguments persuasive while Cotter's are not. Therefore, Cotter does not fall within the class "clearly intended to be benefited" by the PAA's indemnification under Section 170(d).[8] Accordingly, Cotter failed to establish it has standing as an intended third-party beneficiary of the Mallinckrodt contract and indemnification agreement. *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1296 (Fed. Cir. 2022).

Even if Cotter had standing, it failed to state a contractual claim upon which relief could be granted. "If a plaintiff can establish . . . third party beneficiary status, a plaintiff must also be able to establish 'an obligation or duty arising out of the contract, a breach of that duty, and damages cause by the breach.'" *Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989). The United States argues that Cotter cannot show the government breached the Mallinckrodt contract because it never submitted a PAA indemnity claim. (Mot. to Dismiss at 44–45; Def.'s Reply at 23–25). The United States asserts that Cotter presented "a claim for its costs in this Court as a third-party beneficiary" rather than directly presenting it to the government as required. (Mot. to Dismiss at 44; Def.'s Reply at 24–25). The United States concludes that because Cotter does not and cannot allege the government rejected the indemnification claim, Cotter cannot plausibly allege an "actual breach" of contract. (Mot. to Dismiss at 44–45).

---

[8] The United States does not cite "other objective evidence" to further its argument that Cotter was not an intended third-party beneficiary. (*See* Mot. to Dismiss at 41–46). Therefore, the Court will not further analyze "other objective evidence." *Baude*, 955 F.3d at 1304–05.

Cotter argues it "had no duty to present an indemnity claim to the government." (Pl.'s Resp. at 33). To support this assertion, Cotter cites SA No. 124 arguing that "at most" only Mallinckrodt was required to present a claim. (*Id.* at 34). However, Cotter does not expand on this point nor address the language used in multiple SAs that required Mallinckrodt as the contractor to promptly notify the AEC about pending claims and submit "pertinent papers" to the Commission. (*See, e.g.*, Ex. A at 495 at Art. III-E(3)).

Cotter further contends that even if it did have a duty to submit a claim, SA No. 124 provided that any government obligations "shall not be affected by any failure on the part of the Contractor to fulfill any of its obligations under this contract." (Pl.'s Resp. at 34 (citing Ex. A at 745)). Cotter continues that because the United States was aware of the *McClurg* litigation, it breached its indemnification agreement by failing to participate in mediation and fulfill its legal obligations. (*Id.* at 34–35). However, Cotter is unconvincing. Cotter's arguments boil down to the assertion that the government should indemnify Cotter simply because it was a defendant in *McClurg*. Cotter does not allege the United States was aware that it was seeking indemnification before this suit was filed. Cotter also does not allege that the United States ever refused indemnification before this Motion. Therefore, Cotter did not provide sufficient factual detail to put the United States on notice for its breach of contract claim. *See Dobyns v. United States*, 91 Fed. Cl. 412, 422–30 (2010).

## II.   Conclusion

For the stated reasons, Cotter failed to allege facts plausibly suggesting entitlement to relief on its statutory and contractual claims. Accordingly, the Court finds that Cotter failed to state a claim upon which relief can be granted for Count I. Further, Cotter failed to establish standing, therefore this Court does not possess subject-matter jurisdiction to render a decision on the merits of Count II. Therefore, the Court **GRANTS** the United States' Motion to Dismiss pursuant to RCFC 12(b)(1) and (6).

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**



s/     David A. Tapp
DAVID A. TAPP, Judge